## JARMAN v. KNIGHTS TEMPLARS' & MASONS' LIFE INDEMNITY CO. OF ILLINOIS.

(Circuit Court, W. D. Missouri, W. D. June 26, 1899.)

No. 2,341.

1. CONSTITUTIONAL LAW—IMPAIRMENT OF CONTRACTS—LIFE INSURANCE POLICIES.

The statute of Missouri (Rev. St. 1889, § 5855), providing that suicide shall not be a defense to any policy of life insurance unless it was contemplated by the insured at the time of his application, is not one relating to the remedy, but enters into the consideration, and becomes a constituent part of every policy of insurance to which it applies; hence such policies are within the provision of the federal constitution against the impairment of contracts, and cannot be affected by a subsequent repeal of the statute.

2. LIFE INSURANCE—MISSOURI STATUTES.

The act of 1887 (Rev. St. Mo. 1889, § 5869), relating to foreign insurance companies, which provided that life insurance companies doing business on the assessment plan, and which complied with the act, should not be subject to the general insurance laws of the state, did not repeal the prior statute (Rev. St. 1889, § 5855), cutting off defenses on the ground of suicide, nor was it retroactive, but it merely exempted assessment companies from the operation of such statute as to policies thereafter issued and while section 5869 remained in force.

3. SAME—ASSESSMENT COMPANIES—EFFECT OF CHANGE IN CONSTITUTION.

A policy of life insurance issued by an assessment company provided for the payment to the widow or heirs of the insured, on his death, of a certain sum, together with the amount of all assessments paid by him during his lifetime. The application, which was made a part of the policy, contained this provision: "I further agree, if accepted, to abide by the constitution, rules and regulations of the company as they now are or may by the constitution be changed hereafter." Held, that such provision could not be construed to authorize the company to reduce the amount payable, under the terms of the policy, by an amendment of its constitution striking out the provision for paying back the assessments paid by a policy holder on his death, but that such an amendment could have only a prospective operation.

This was an action on a life insurance policy, tried to the court without a jury, by stipulation of the parties.

Harber & Knight, for plaintiff.

Saml. B. Huston, Alex. B. Huston, and Hervey B. Hicks, for defendant.

PHILIPS, District Judge. This case was submitted to the court without the intervention of a jury, on the agreed statement of facts, with some additional evidence; and the controversy, briefly stated, grows out of substantially the following state of facts: The defendant is a life insurance company, doing business on what is known as the "assessment plan," by which it issues policies of insurance to Masons who become members of the company on application. In 1885 it issued a policy to John P. Jarman, whereby, in case of death and proof thereof, it promised to pay to his wife, or children, or heirs, in the order named, the sum of $5,000 and all assessments paid to the company by the assured. In 1898 the assured died by a gunshot wound inflicted by himself while insane. This suit is brought by his wife to recover on the policy. The principal matters of defense

interposed by the defendant are: (1) That the policy exempts the defendant from liability for death resulting from an act of suicide; and (2) if it should be held by the court that said provision of the policy was void, under the statute of Missouri in force at the time of the issue of the policy declaring that the fact of suicide should be no defense to a suit on a life policy, then the defendant is not required to pay to the plaintiff the sum of all the assessments paid in by the assured during his lifetime, for reasons which fully appear in this opinion.

The first question. therefore, for decision, arising on the facts and evidence submitted, is, does the fact that the insured died by his own hand defeat the right of recovery on this policy? At the time of the issue of the policy,—which, admittedly, was a Missouri contract,—the following provision of the Missouri statute was in force:

"In all suits upon policies of insurance on life hereafter issued by any life insurance company authorized to do business in this state, it shall be no defense that the insured committed suicide, unless it shall be shown to the satisfaction of the court or jury trying the cause, that the insured contemplated suicide at the time he made his application for the policy, and any stipulation in the policy to the contrary shall be void." Section 5982, Rev. St. Mo. 1879; section 5855, Rev. St. Mo. 1889.

The language of the statute is comprehensive. It applies to all "policies of insurance on life hereafter issued by any life insurance company doing business in this state." On a life policy issued by this same defendant tried in this court, it was distinctly held by Judge Caldwell, on the circuit (Berry v. Indemnity Co., 46 Fed. 439), that this company at the time in question was engaged essentially in life insurance business, and nothing else. This ruling was affirmed by the court of appeals. 1 C. C. A. 561, 50 Fed. 511. It was as distinctly further held in this case that said section of the Missouri statute applied to such policies, and cut off the defense of death by suicide. The policy sued on in that case was issued in 1885, and the act of suicide was committed in November, 1889. As in the case at bar, the act of suicide was subsequent to the enactment of the statute of 1887, now section 5869, Rev. St. Mo. 1889, relied on by defendant to avoid the operation of said section 5855. Said act of 1887, after directing that all insurance companies doing business in the state should make certain returns to the insurance department touching the state of its affairs, and subjecting it to visitation and examination, contained the following clause:

"And all such foreign companies are hereby declared to be subject to, and required to conform to, the provisions of section 5912 of the Revised Statutes of Missouri of 1889: provided, always, that nothing herein contained shall subject any corporation doing business under this article to any other provisions or requirements of the general insurance laws of this state, except as distinctly herein set forth."

The only feature which, in this respect, differentiates the Berry Case from this, is the fact that in the former it did not appear from the evidence that the defendant company had ever complied with the provisions of the act of 1887, or that it was doing business in Missouri under the requirements and liabilities imposed by the act; while in the case at bar it does appear that, in 1888, the company com-

plied with said statute, attempting to do business in the state on the assessment plan.

It is to be conceded to defendant that, as to policies issued on the assessment plan, subsequent to the statute of 1887 and prior to 1897, said section 5855, denying the defense of suicide, does not apply. Haynie v. Indemnity Co., 139 Mo. 416, 41 S. W. 461. The policy in the Haynie Case was issued in 1888, and the insured committed suicide in 1893. It is on said act of 1887 that the defendant's counsel have builded a most elaborate argument, on the assumption that this act superseded and repealed the provisions of said section 5855 in respect of assessment companies, and therefore the rights of the parties in this action are to be determined as if said section 5855 had been expunged from the statutes at the time the cause of action arose in this case. In support of this contention, reliance is placed upon rulings akin to that in Ewell v. Daggs, 108 U. S. 143, 2 Sup. Ct. 408, which was, in effect, that when the right of a party to a given contract to avoid it on the ground of a statutory enactment based upon the declared public policy of the state, where such right pertains rather to the remedy than an essential element of the contract, inducing its execution, may, by subsequent act of the legislature, be entirely taken away, the parties are remitted to the terms of the contract as expressed on its face. Judge Shiras, who wrote the opinion of the court of appeals in the Berry Case, declined to pass affirmatively upon the correctness of this contention, because it did not appear from the record before him that the company had complied with the provisions of the act of 1887, entitling it to plead exemption from the operation of said section 5855. But it is quite apparent from the trend of his observations that the inclination of his mind was against the contention of the defendant, if the requisite facts had appeared. In that connection he said: ·

"Before this question can arise, it must be made clear that the legislature of the state intended to repeal, by the act of 1887, the provisions of section 5982 (now section 5855), in its applications to policies previously issued by companies doing business under the assessment plan; and, in our judgment, the intention to repeal the section in this particular is not made clear. In the first place, the legislature of Missouri has not repealed section 5982 (now section 5855). It is still the law of the state that companies engaged in the business of life insurance shall not be permitted to exempt themselves from liability for death by suicide, not contemplated when the application for its insurance is made."

His assertion was correct. The act of 1887 only exempted assessment companies from the operation of section 5855. In other words, it only suspended its operation in its application to assessment insurance companies; and, in view of the general law, and especially of the constitution of Missouri, the act of 1887 only had, and could only have, a prospective operation, and in no degree affected antecedent policies issued by such companies.

Counsel misconceive the character of section 5855. It is something more than a mere declaration of the state as to its public policy prohibiting such contracts, and affecting merely the remedy, which the legislature might at will revoke, leaving in force the provisions of a policy that an act of suicide could be pleaded to defeat recovery

thereon. On the contrary, this statute became a constituent element of the contract itself between the parties, constituting a part of the consideration for entering into the contract. In contemplation of law, it was the same as if it had been written into the face of the policy, that, in case of suit to enforce the payment of a stipulated sum, the defendant should not plead thereto that the insured committed suicide, unless it should be shown that the insured contemplated suicide at the time he made his applicataion for the policy, and any stipulation in the policy to the contrary should be void. Judge Dillon, in White v. Insurance Co., 4 Dill. 177, Fed. Cas. No. 17,545, speaking of another section of this same statute respecting the effect of misrepresentations made in obtaining or securing the policy, said:

"We are of opinion that policies of insurance issued and delivered in Missouri, after that act took effect, fall within its prospective operation, and, as to such policies, the act is to be treated as if incorporated therein. * * * The general rule is that the laws in existence are necessarily referred to in all contracts made under such laws, and that no contracts can change the law."

This same principle was announced by Chief Justice Sherwood in State v. Berning, 74 Mo. 87:

"For whatsoever the law annexes as the incident of a contract, whether granting a privilege or announcing a prohibition, is as much part and parcel thereof as though written therein or indorsed thereon."

See, also, Reed v. Painter, 129 Mo. 680, 31 S. W. 919.

Again, in the recent case of Cravens v. Insurance Co., 50 S. W. 519–524, the supreme court say:

"Being a Missouri contract, the statute then in force, with respect to the subject-matter of the contract, entered into and became a part thereof as much so as if copied therein."

We may conclude this part of the discussion by the application of the appropriate language of Mr. Justice Gray in Society v. Clements, 140 U. S. 233, 11 Sup. Ct. 825, which went from this court:

"The statute is not directory only, or subject to be set aside by the company with the consent of the assured, but it is mandatory, and controls the nature and terms of the contract into which the company may induce the assured to enter."

The provisions of section 5855 being a constituent part of the contract of insurance, it would not have been competent, even had it so attempted, for the legislature to destroy the protecting provisions of this statute by a subsequent repeal thereof (which it does not attempt to do), as it relates to antecedent policies of insurance; this, for the obvious reason that the constitution of the United States prohibits the states from passing any law impairing the obligation of contracts. As said in McCracken v. Hayward, 2 How. 612:

"The obligation of a contract consists in its binding force on the party who makes it. This depends on the laws in existence when it is made. These are necessarily referred to in all contracts, and forming a part of them, as the measure of obligation to perform them by the one party and the right acquired by the other. * * * If any subsequent law affect to diminish the duty, or to impair the right, it necessarily bears on the obligation of the contract, in favor of one party to the injury of the other; hence any law which in its operation amounts to a denial or obstruction of the rights accruing by the contract, though professing to act only on the remedy, is directly obnoxious to the prohibition of the constitution."

The act of 1887 was not retrospective in its operation. "It is a sound rule of construction that a statute should have a prospective operation only, unless its terms show clearly a legislative intention that it should operate retrospectively. And some states have deemed it just and wise to forbid such laws altogether by their constitution." Cooley, Const. Lim (5th Ed.) 456. The constitution of Missouri (article 2, § 15) declares "that no ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation," etc., "can be passed by the general assembly."

But what is still more fatal to the position of defendant is the fact that in March, 1897, the legislature of Missouri (Laws Mo. 1897, p. 130) repealed said act of 1887 (section 5869 aforesaid of the Revised Statutes of Missouri of 1889), and expressly subjected insurance companies on the assessment plan to the provisions of said section 5855; thus clearly showing the legislative construction that, by the act of 1887, said section 5855 was not repealed, but such companies were only for the time being exempted from its operation. Clearly enough, the mere repeal of said act of 1887 would have remitted such insurance companies, and such policies of insurance as the one in question, to the operation of section 5855, without the affirmative provision expressly applying it to such companies. The effect, therefore, of this act of 1897, was to place this contract of insurance in the precise attitude in which it stood in 1885, when the policy was issued, and would avail this plaintiff, the death of the assured occurring subsequent to the act of 1897. At all events, it effectually meets the argument of counsel. If the act of 1887 was a recall of the public policy of the state respecting such companies, as declared in said section 5855, this public policy was reasserted by the act of 1897. In this respect the facts of the case are essentially different from that class of cases cited by counsel in which the statutes in question had been repealed. The result is that the first question arising on this record must be answered in the negative.

The remaining question for consideration is as to the amount of recovery on this policy. On its face, the policy provides that, within 60 days after notice and proof of death, the company will pay the widow, children, etc., in the order named, the sum of $5,000, and all money paid by the assured in assessments, subject to the limitation as to the amount of such payment provided in section 1 of article 7 of the constitution of the company, printed on the back of the policy, which section is as follows:

"Upon due notice and satisfactory proof of death of a member of this company, the board of directors shall, within 60 days, pay ·the widow, children, or heirs of the deceased member (and in the order named, unless otherwise ordered by the member during his lifetime or in his will) the amount set forth in the deceased member's policy of membership: provided, that the policy or membership for $5,000 shall be good for all money in the death fund arising from one assessment, provided it shall not exceed $5,000, and all money paid on the policy in assessments."

It is admitted by the agreed statement of facts that, at the time of the death of the deceased, he held a policy in the company for $5,000, and that the assessments paid by him amounted to $811.83. Clearly enough, therefore, without something more, the amount of recovery on

this policy would be $5,000, plus the sum of the assessments thereon, to wit, $811.83, with interest at 6 per cent. per annum from the 28th day of November, 1898, the day agreed upon when the right of action accrued. To avoid this conclusion, the defendant invokes the following, found in the application of the assured for membership: "I further agree, if accepted, to abide by the constitution, rules, and regulations of the company, as they now are or may by the constitution be changed hereafter." The application further stated that "the application on which this policy is issued is made a part of this policy by reference thereto." It is claimed by defendant that, in pursuance of the authority thus conferred upon it by the assured, on the 8th day of January, 1889, the board of directors amended section 3, art. 4, of the constitution, so as to read: "Policies of membership may be issued upon a basis of benefits ranging in amounts to five thousand dollars and all money paid in assessments upon the policy for the first five years;" and sections of article 7 were amended in conformity thereto,—by which amendment the amount of assessments to be returned to the beneficiary on the death of the assured was only "for the first five years," instead of all the assessments paid by the assured, as provided in this policy. So that, under this amendment, the amount of assessments to be refunded would be $192, instead of $811.83, as provided on the face of the policy. Having experimented with this change, in January, 1898, the board of directors took an additional long step in the same direction, by striking out entirely the provision for paying back assessments, under which defendant claims it is relieved from paying this plaintiff any assessments collected from the assured.

The question to be decided is, was it reasonably within the contemplation of the parties, in executing the contract of insurance, that such changes might be made, in the regulations and constitution of the company by its board of managers, as to actually diminish the amount agreed to be paid to the wife, children, or heirs of the assured on his death? It has been fitly said that common sense and good faith are the leading characteristics of all interpretations of contracts. If the board of directors was authorized to go thus far, where is the boundary line to be placed beyond which it may not go in cutting down the value of the policy? If the extent of such diminution rests absolutely in the discretion or judgment of the governing board, it can as well say that the company will pay to the wife or children only $4,000 or a less sum on the death of the assured. Such a construction is so at variance with the conception of an honest mind as to challenge its correctness. Perceiving the force of this suggestion, counsel for the company place their ultimate argument upon the ground that the proper limitation of such amendments is the dividing line between what is reasonable and what is unreasonable. It must readily occur to the judicial mind that such ground is dangerous quicksand; for the jury or court, whichever might be called upon to determine this question, would be in danger of making for one or the other or both of the parties to this policy a contract upon which their minds never met. This is fitly illustrated by the reasoning of counsel whereby the amendment of 1889 is justified in

reducing the recovery for paid assessments to those paid within the first five years; and, by the same process of reasoning, the amendment of 1898 is justified, whereby the whole provision of the contract allowing recovery of any assessments whatever is wiped out. And it is not clear to the average mind why the same specious logic might not be employed to justify an amendment whereby, instead of paying the sum of $5,000, only $4,000 should be paid, on a like assumption that such reduction of liability would lessen the amount of assessments made upon the assured to meet such losses, and would produce greater equality among the policy holders who received their policies prior and subsequent to such amendments, and further strengthen the financial basis on which the institution rests. There is great common sense in the utterance of the court in Walsh v. Hill, 38 Cal. 481, that, "in the construction of written instruments, we have never derived much aid from the technical rules of the books. The only rule of much value—one which is frequently shadowed forth, but seldom, if ever, expressly stated in the books—is to place ourselves as nearly as possible in the seats which were occupied by the parties at the time the instrument was executed; then, taking it by its four corners, read it." The underlying vice of defendant's argument is that the assumed methods of working out the conception of insurance experts for better sustaining the business of the company is a refinement which could not be said to have been in the reasonable expectation of the policy holder at the time he was induced to take his membership. On the face of the policy, he was assured that, in the event of his death, his wife or children would receive $5,000 and all the sums he might pay in by way of assessments. And it may well be imagined how this provision was made attractive to Mr. Jarman by the persuasive tongue of an insurance solicitor; for, on its face, the allurement was held out to him, not only that his family should receive $5,000, but that whatever assessments should be imposed upon him to raise the necessary funds for paying other losses would be returned to his family. No such possibility was apparent or stated to him by the agent of the company as is sought to be worked out by the experts to justify either of said amendments. No such amendments had ever before been made to the constitution of this company, and the conception even of the experts of the company came four years later. As was said by the supreme court of this state: "It is a rule of construction that the promisor is bound according to the sense in which he apprehended that the promisee received his proposition." Bruner v. Wheaton, 46 Mo. 363. And, while the rule may at times be abused in its application, it certainly is a correct one, as applied to this instance, that the application for the policy of insurance having been drawn by astute counsel of the company, who study with care to make it favorable to the company, and employ technical terms unfamiliar to the assured, "it is only a fair rule which the courts have adopted to resolve any doubt or ambiguity in favor of the insured against the insurer." It is not too much to say that, at the time this company so amended section 3, art. 4 (to which sections 1 and 4 of article 7 were made to conform), its directors had no thought that it had any retroactive effect. The language is: "Policies of membership

may be issued upon a basis of benefits, ranging in amount to $5,000, and all money paid in assessments upon the policy for the first five years;" that is, future policies may be so issued. As already laid down in this opinion, all statutes and constitutional provisions are presumed to be prospective in their operation, unless the contrary appears upon their face. It may be conceded that it was perfectly competent for the board of directors to make such amendments to affect all after-issued policies, and all subsequent members would take subject thereto, and would be amenable to the method thus established of assessments to pay for losses. The argument of counsel that this condition of affairs would have the effect to increase the amount of assessments on anterior policy holders, and might in practice produce other complications, such as adding to the work of accounting clerks in making monthly estimates of the liabilities and the like, is but the argument ab inconvenienti. No difficulty arises in this case about paying the sum of assessments paid in by the assured, because there is no claim that there is not sufficient money in the death fund to pay the maximum loss in full. The assured has the right to say to this company: "I have not asked you to lessen the burden of my assessments, and perhaps it would not concern you so much, but for the fact that the amount, under my contract, which would be paid my family, is far greater than the small diminution of my assessments." While the result of the intricate sum worked out on paper by the company's experts may prove advantageous to the company, and possibly to future policy holders, it ought not to be done at the expense of the anterior policy holder.

It is among the recognized canons of the rules of construction that when operation and effect can be given to each and every part of a contract or statute, without giving to one provision a construction which subverts or qualifies another material provision, that which preserves the harmony and force of all should be preferred. There were many provisions of the rules and constitution of the company in force at the time of issuing the policy upon which the stipulation respecting amendments could properly operate, justifying a judgment that the reasonable application of the stipulation should be referred to such matters, without impairing the express obligation of the company to pay a specified sum readily ascertainable. The natural and more reasonable idea such a recitation as the one in question in the application for membership would convey to the mind of the applicant would be only that he was consenting, in advance, to such changes in the regulations and constitution of the company as, in the judgment of the board of directors, might seem to be conducive to the more efficient conduct and administration of the business, pertaining to methods, discipline, restriction on travel, and the acts of the assured, or the amount of annual dues or assessments, as well as the employment and investment of the death fund, and other like matters. But it is inconceivable that either party could have intended that the construction might be placed upon the application that the applicant was consenting, in advance, that the promise expressed on the face of the policy to pay his family or heirs could be changed, either at the pleasure of the directors or upon some ground

of expediency resting in the mind of some future board of directors, or even that of a court or jury. In short, that he was consenting that the very essence of, and inducement to, the contract on his part depended upon other basis than that of the express promise written in the policy. It seems to me, with all due deference, that to give such construction to this policy would make it but a snare and a delusion to entrap the unwary. It took four years after issuing this policy for the managing officers of the company to bring themselves to the attempt to cut down the value of this policy to the extent of limiting the amount of assessments to be returned to the period of five years, and then, after waiting nine years more, during which time the assured was promptly paying his dues and assessments, they ventured upon the further experiment of attempting, by one stroke of the pen, to expunge entirely the provision for returning any assessments whatever. Such a construction of the contract cannot receive the consent of this court. The court, therefore, finds this issue for the plaintiff, and directs a judgment for the plaintiff in the sum of $5,811.83, with interest thereon from November 28, 1898, at the rate of 6 per cent. per annum.

The plaintiff demands further judgment of 10 per cent. damages on the amount awarded. The demand is based upon section 5927 of the Revised Statutes of Missouri of 1889, which authorizes the court to allow the plaintiff damages not exceeding 10 per cent. on the amount of the loss, "if it appear from the evidence that such company has vexatiously refused to pay such loss." In view of the fact that the provision of the act of 1887 and the amendments to the constitution of this company, made in 1889 and 1896, have not heretofore been construed by any court in this jurisdiction, and the court being of opinion that the defendant and its counsel are sincere in their contention, this claim for damages is disallowed.