GEORGE SCHMIDT et al., Appellants, v. SUPREME COURT UNITED ORDER OF FORESTERS.

Division One, June 14, 1910.

1. LIFE INSURANCE: Suicide: Fraternal Society: No License. A provision in the policy issued to a citizen of this State by a fraternal beneficiary association organized under the laws of another State, that suicide shall be an absolute bar to any recovery thereon by his beneficiaries, will not defeat a recovery where the company was not licensed to do business in this State at the time the policy was issued but was so licensed when the insured committed suicide; but such clause in the contract must be held to be governed by the statute (Sec. 7896, R. S. 1899), which provides that suicide shall be no defense unless it be shown that the insured contemplated suicide at the time he made his application for the policy. The statute (Sec.

1408, R. S. 1899) exempting fraternal beneficiary associations from the provisions of the general statute (Sec. 7896) applies to only such associations as were "doing business in this State" at the time the policy was issued, that is, were licensed to do business in the State as the act authorizes and requires, and unless the company was so licensed it cannot claim such exemption.

2. ———: ———: Foreign Corporation: Statutory Exemptions: Not Licensed. A foreign fraternal beneficiary association cannot claim the benefits of an exemption provided by the statutes of this State until such time as it places itself in a position to claim them; it cannot claim the benefits of the statutory exemption merely because its contracts are of the character mentioned in the statutes, but to claim them it must come into the State in the manner prescribed by the law and make its contracts under the law. If it does that, then the exempting statutes are read into its contracts and become a part thereof, but until it does that the general law must be read into each of its contracts made with a citizen of the State. And if such general law once becomes a material constituent part of the contract, it cannot be eliminated therefrom by any subsequent act of the company, or by any stipulation contrary thereto placed in the contract by it and accepted by the citizen.

3. ———: ———: Matter of Procedure. That part of the statute declaring that "any stipulation in the policy to the contrary shall be void," found in the statute (Sec. 7896, R. S. 1899) providing that, "In all suits upon policies of insurance on life hereinafter issued by any company doing business in this State, to a citizen of this State, it shall be no defense that the insured committed suicide, unless it shall be shown to the satisfaction of the court or jury trying the cause, that the insured contemplated suicide at the time he made application for the policy, and any stipulation in the policy to the contrary shall be void," is substantial law and vitally affects all policies to which it applies, and the statute is not merely a statute of procedure. The legal effect of the statute is to strike down and eliminate all clauses of a contract of insurance that contravene its terms.

4. ———: False Statement. A statement in an application for an insurance policy that the insured had no brothers or sisters is not shown to be false, in the sense of being material or contributing to the contingency on which the policy was to become payable, by proof that he had half-brothers and half-sisters.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neill Ryan*, Judge.

REVERSED AND REMANDED.

*F. A. Wislizenus* and *W. F. Heideman* for appellants.

(1) The insurance contract of a fraternal society which has not qualified under section 1410, R. S. 1899, is governed by the insurance laws of our State. Provisions in such insurance contracts which deny liability in case of suicide of the insured are void under section 7896, unless suicide was contemplated at application (which is out of this case). Provisions avoiding the insurance on account of false representations are also void under section 7890, unless they contribute to the loss (which is also out of this case). Brassfield v. Knights, 92 Mo. App. 102; Toomey v. Supreme Lodge, 74 Mo. App. 507, 147 Mo. 129; Brassfield v. Modern Woodmen, 88 Mo. App. 210; Kern v. Legion of Honor, 167 Mo. 471. (2) Provisions in the insurance contract of a fraternal society, looking to the alteration of the contract by the society, should be construed as referring merely to administrative and regulative enactments; not as going to the reduction or withdrawal of the consideration for which assessments are charged. Smith v. Supreme Lodge, 83 Mo. App. 512; Morton v. Supreme Council, 100 Mo. App. 76; Campbell v. American Benefit Club, 100 Mo. App. 249; Sisson v. Supreme Court, 104 Mo. App. 54. (3) Even though such fraternal society have the right to modify the contract in a way substantially reducing its liability, any act on its part offered as exercise of that power must be shown to be retroactive beyond doubt, or else it will be held not to apply to contracts preceding such act. Huff v. Woodmen, 85 Mo. App. 102; Smith v. Supreme Lodge, 83 Mo. App. 512; Morton v. Supreme Council, 100 Mo. App. 90. (4) Specifically

is it true that a foreign fraternal society which puts itself under the provisions of the laws of Missouri relating to such organizations, does not by that mere act change its insurance contracts entered into prior thereto. Huff v. Woodmen, 85 Mo. App. 102.

*Douglas W. Robert* for respondent; *Robert & Robert* of counsel.

(1) (a) The contract, *i. e.*, the application, the certificate and the by-laws having provided that the respondent would not pay in the event of the suicide of the insured, the respondent having complied with the laws of this State relating to fraternal associations, was entitled to immunity from the general insurance laws and to rely on suicide and breach of warranty as defenses. R. S. 1899, secs. 1408-9-10; Hudnall v. Modern Woodmen, 103 Mo. App. 356; Richmond v. Supreme Lodge, 100 Mo. App. 8; Shotliff v. Modern Woodmen, 100 Mo. App. 636; McDermott v. Same, 97 Mo. App. 636; Morton v. Royal Tribe, 93 Mo. App. 78; Legion of Honor v. Neidlet, 81 Mo. App. 598. (b) The application, the certificate and the by-laws of the respondent formed the contract. Richmond v. Supreme Lodge, 100 Mo. App. 19; Sheele v. Lodge, 63 Mo. App. 277; State ex rel. v. Benev. Soc., 42 Mo. App. 488; Grand Lodge v. Sater, 44 Mo. App. 452; Mulroy v. K. of P., 28 Mo. App. 472; Grand Lodge v. Elsner, 26 Mo. App. 117; Laker v. Royal Union, 95 Mo. App. 353; Slater v. K. & L. H., 76 Mo. App. 387. (2) (a) There is a broad distinction between those cases which hold that a fraternal association may not change its by-laws so as to affect the contract even though the assured has agreed to be bound by or to abide by future changes, and those which hold that, when the insured agrees, the laws of the order in force at the time of his death shall determine the rights of the beneficiaries, or the validity of the certificate. Richmond v. Supreme Lodge, 100 Mo. App. 8; Morton v. Supreme Council.

100 Mo. App. 94; Morton v. Royal Tribe, 93 Mo. App. 78; Toomey v. Supreme Lodge, 74 Mo. App. 517. (b) No rights accrue in a fraternal beneficiary certificate until after the death of the member. Richmond v. Supreme Lodge, 100 Mo. App. 8; Morton v. Royal Tribe, 93 Mo. App. 78; Legion of Honor v. Niedlet, 81 Mo. App. 598; Toomey v. Supreme Lodge, 74 Mo. App. 517; Masonic Ben. Assn. v. Bunch, 109 Mo. 579. (c) In this case it is admitted that the by-laws in existence at the date of Fosz's death were the same as those in force when the certificate was issued. (3) The agreement making the answers warranties is valid. If the answers are false it is a good defense, for the warranty must be literally true. McDermott v. Woodmen, 97 Mo. App. 636; Van Cleve v. Casualty Co., 82 Mo. App. 688; Ashford v. Ins. Co., 80 Mo. App. 638; Aloe v. Ins. Co., 164 Mo. 675, 147 Mo. 571; Whitmore v. K. & L. of H., 100 Mo. 36.

GRAVES, J.—This case has been certified to this court by the St. Louis Court of Appeals. The reason for so certifying the case is that said court was of opinion that the views which it had expressed conflicted with those of the Kansas City Court of Appeals in the case of Huff v. Woodmen, 85 Mo. App. 96.

A short statement of the facts will suffice. Plaintiffs are the half brothers and sisters of one Charles Henry Fosz. The defendant is an alleged fraternal beneficiary association, chartered by the State of Wisconsin. On December 1, 1901, the defendant issued to the said Fosz one of its certificates of insurance in the sum of one thousand dollars. By the terms of the certificate the defendant agreed to pay Wilhelmina Smith (Schmidt) the mother of Fosz, the said sum of one thousand dollars, or so much thereof as might be realized from one full assessment of its membership. It was admitted that one full assessment would bring more than one thousand dollars, so this limitation of

the amount to be paid becomes immaterial. The mother died January 5, 1902, and Fosz died May 15, 1903. It stands admitted that Fosz committed suicide. Fosz died without designating another beneficiary, and in this contingency a by-law of the society or association provided for the brothers and sisters as beneficiaries.

The defendant urged two defenses, (1) suicide in violation of terms of the certificate, and (2) false statements in the application. In the application, which is made a part of the contract, deceased stated that he had no brothers and sisters, and the proof discloses that he only had half-brothers and half-sisters. The case turned below and in the Court of Appeals upon the question of suicide. Upon this question material portions of the application made by deceased are as follows:

"2. I declare I am in good, sound mental and physical health, and agree that this declaration, together with the answers in medical examination paper, and the law, rules and usages of said order, shall be part of my contract with said order.

"4. That if my death ensues by reason of suicide or self-destruction, voluntary or involuntary, or while sane or insane, no benefits shall be due to my beneficiary or beneficiaries on account of my death.

"7. That the laws of the society, in force on the date of my death, shall determine the rights of my beneficiary or beneficiaries, and that this application and all rights and privileges accruing to me or my beneficiary or beneficiaries thereunder, shall be limited by and subject to all laws, rules and regulations which are now in force, or which may hereafter be enacted or adopted by the United Order of Foresters.

"10. That in case of a suit for a death benefit by my beneficiary or beneficiaries, against the society, the burden shall rest upon such beneficiary or beneficiaries to prove my application, membership and the consti-

tution and laws in force at the time of my death, as well as the furnishing of due notice of and proof of death.''

Upon the same question, the following by-laws of the society were in existence at the time deceased applied for and received the certificate:

"Law 23, Section 1. The supreme power and authority of the order is hereby vested in the Supreme Court, and the same shall be exercised in such manner as said court may determine.

"Section 2. The Supreme Court shall at all times have power to enact such laws as it may deem proper for the government of the order and the management of its affairs, which laws shall at all times determine the rights and obligations between the order and its members; and the order at all times reserves the right and power in said Supreme Court to make such changes in existing laws as it may deem for the best interest of the order, and all certificates providing for the payment of any benefits to any member, or to any person as his beneficiary, shall be forever issued subject to such reserved right and power.

"Law 62. Section 9. The United Order of Foresters does not insure against suicide nor against self-destruction, and if any member shall commit suicide or self-destruction or shall be the means in any manner of taking his own life, he shall by such act forfeit his certificate of membership, together with all rights and benefits due him or his beneficiary or beneficiaries from the Supreme Court or High Court or a Subordinate Court.''

In brief of counsel for the plaintiff it is admitted that defendant is a fraternal association under the laws of Wisconsin.

The proof shows that defendant did not comply with the laws of Missouri as a fraternal beneficiary association until January 6, 1902, but on said date did comply with such law, and from that time until the

death of Fosz was licensed to do and did business in Missouri as such fraternal beneficiary association.

The judgment of the circuit court of St. Louis was for the defendant, and this judgment the St. Louis Court of Appeals affirmed.    [Schmidt v. United Order of Foresters, 124 Mo. App. 165.]    The case reaches this court as before stated.    This sufficiently states the case.

The real bone of contention in this case lies in the fact that the certificate sued upon was issued some thirty-six days prior to the time the defendant qualified and took out the license to do business in the State as a fraternal beneficiary association or society. Plaintiffs concede that had defendant qualified and taken out its license under the provisions of the Act of 1897, prior to the issuance of the policy, there would be no liability.    In other words, the plaintiffs contend that although defendant was in fact a fraternal beneficiary association, yet it is not entitled to the exemptions given such associations by the Act of 1897, until such time as it brings itself within the purview of the act by qualifying and taking out a license under the act.    Plaintiffs say that, inasmuch as our general insurance laws preclude suicide as a defense, the contract in question was under that law when made, and by that law the clause as to suicide as a matter of defense was effectively stricken from the contract, and no act of the defendant thereafter, by way of qualifying and taking out license under the other law, can change the thus fixed terms of the contract.    Stating the question differently, they urge that whilst the contract on its face contains a clause exempting the defendant from liability in the event of suicide, yet under section 7896 of the general insurance laws, such clause was stricken from the contract by force of the statute, and the contract thereby became one by the terms of which indemnity was granted and given as against death by suicide, and this contract could not be changed by the

association later qualifying under the law relating to fraternal beneficiary associations. The question is one not without difficulties. Apparently there is a conflict between the holdings of the St. Louis Court of Appeals and that of the Kansas City Court of Appeals. As to how far this apparent conflict will appear to be real, will be seen from our discussion of the question. The question involves a thorough examination of statutory provisions and previous rulings thereon.

The question here is different from Tice v. Knights of Pythias, 204 Mo. 349, in this, that the certificate in the Tice case was issued after the association had been licensed to do a fraternal beneficiary insurance business in this State. We had in mind in writing the Tice case the very question involved in the present case, and were therefore cautious in our language, not desiring at that time to pass upon a question which was not involved in that case. We said in that case:

"The certificate of insurance in the present case was issued in 1898, after the Act of 1897 went into effect. The defendant was at the time licensed and doing business under the provisions of the Act of 1897. Into this contract we must therefore read the Act of 1897. A part of section 1408, Revised Statutes 1899, which is a part of the Act of 1897, Laws 1897, p. 132, reads as follows: 'Such association shall be governed by this act and shall be exempt from the provisions of the insurance laws of this State, and shall not pay a corporation or other tax, and no law hereafter passed shall apply to them unless they be expressly designated therein.'

"By this it will be seen that at the date of the issuance of this certificate of insurance the defendant was especially exempted from the provisions of the general insurance laws of the State, and therefore exempted from the provisions of section 7896, Revised Statutes 1899. This exemption, with the holding in the

Westerman case to the effect that the business of the defendant was not for profit and was fraternal beneficiary insurance, saps the life-blood from the only contention made by the plaintiff herein."

It will be noticed that we specifically state that the certificate was issued after the defendant in the' Tice case had qualified and been licensed to do business under the Act of 1897.

We proceed now to what the writer had in mind then, *i. e.,* an analysis of our statutes and holdings as applied to the facts of this particular concrete case.

The Act of 1897, which covers the field of fraternal beneficiary associations, was composed of sixteen sections, exclusive of the repealing clause or section, and exclusive of another section which specially repealed two sections of Revised Statutes 1889 and enacted one new section in lieu thereof. These sixteen sections are sections 1408 to 1423, inclusive, Revised Statutes 1899. Section 1408 defines fraternal beneficiary associations, and then says:

"Such associations shall be governed by this act and shall be exempt from the provisions of the insurance laws of this State, and shall not pay a corporation or other tax, and no law hereafter passed shall apply to them unless they be expressly designated therein. And such fraternal beneficial association may create, maintain, disburse and apply a reserve or emergency fund in accordance with its constitution or by-laws."

Section 1409 reads: "All such associations coming within the description as set forth in section 1408 of this article, organized under the laws of this or any other State, province or territory, and now doing business in this State, may continue such business: Provided, that they hereafter comply with the provisions of this act regulating annual reports and the designation of the superintendent of the insurance de-

partment as the person upon whom process may be served, as hereinafter provided."

Section 1410 reads: "Any such association coming within the description as set forth in section 1408 of this article, organized under the laws of any other State, province or territory and not now doing business in this State, shall be admitted to do business within this State when it shall have filed with the superintendent of the insurance department a duly certified copy of its charter and articles of association, and a copy of its constitution or laws, certified to by its secretary or corresponding officer, together with an appointment of the superintendent of the insurance department of this State as a person upon whom process shall be served as hereinafter provided; and provided, that such association shall be shown to be authorized to do business in the State, province or territory in which it is incorporated or organized, in case the laws of such State, province or territory shall provide for such authorization; and in case the laws of such State, province or territory do not provide for any formal authorization to do business on the part of any such association, then such association shall be shown to be conducting its business within the provisions of this act, for which purpose the superintendent of the insurance department of this State may personally, or by some person to be designated by him, examine into the condition, affairs, character and business methods, accounts, books and investments of such association at its home office, which examination shall be at the expense of such association, and shall be made within thirty days after demand therefor, and the expense of such examination shall be limited to $50."

Other sections provided for (1) the license or permit to do business, (2) the manner of conducting the business, (3) the proceedings in case the association fails to comply with the law, and (4) the punishment of agents or officers of unauthorized associations.

These several statutes were in force at the date the certificate in question was issued. It should be observed that the statutes nowhere declare a certificate issued by an unauthorized association to be void.

Now at the same time there existed under the general insurance law the following statutes:

Revised Statutes 1899, section 7896, which reads: "In all suits upon policies of insurance on life hereafter issued by any company doing business in this State, to a citizen of this State, it shall be no defense that the insured committed suicide, unless it shall be shown to the satisfaction of the court or jury trying the cause, that the insured contemplated suicide at the time he made his application for the policy, and any stipulation in the policy to the contrary shall be void."

Revised Statutes 1899, section 7913, which reads: "Nothing in this article shall be so construed as to impair or in any manner interfere with any of the rights or privileges of any corporation, association or organization doing a life or casualty insurance business in this State under the laws as they now exist; nor as applicable to organizations which conduct their business as fraternal societies on the lodge system, and limit their certificate holders to a particular order or fraternity, or to fraternal beneficiary societies which provide for the relief and benefit of its members or the families, widows, orphans or other kindred dependents of deceased members, or assist such as may be sick or disabled, from the proceeds of assessments upon members of such society or association, and, to that end, issue to its members beneficial certificates, payable at such time and in such manner as shall be therein provided."

The first of these sections appears under article 2 of chapter 119, and the latter under article 3 of chapter 119. Article 2 is entitled "Life and Accident Insurance," and article 3 is entitled "Insurance Companies on the Assessment Plan."

In 1887 there was a statute, section 10, Laws 1887, p. 204, which read: "Every corporation doing business under this act shall annually, on or before the first day of February, return to the superintendent of the insurance department, in such manner and form as he shall prescribe, a statement of its affairs for the year ending on the preceding 31st day of December, and the said superintendent in person or by deputy, shall have the power of visitation of an examination into the affairs of any such corporation, which are conferred upon him in the case of life insurance companies by the laws of this State; and all such foreign companies are hereby declared to be subject to and required to conform to the provisions of section 6013 of the Revised Statutes of Missouri, 1879: provided, always, that nothing herein contained shall subject any corporation doing business under this act to any other provisions or requirements of the general insurance laws of this State, except as distinctly herein set forth." The title of the act was: "An act to provide for the incorporation and regulation of associations, societies or companies doing a life or casualty insurance business on the assessment plan." This section 10 became section 5869 of the Revised Statutes of 1889.

The whole act was amended in 1889, so as to entirely exempt fraternal societies on the lodge system. The amendment read: "Nothing in this act shall be so construed as to impair, or in any manner to interfere with, any of the rights or privileges of any corporation, association or organization doing a life or casualty insurance business in this State under the laws as they now exist, nor as applicable to organizations which conduct their business as fraternal societies on the lodge system, or to any religious or trade society which pays benefits to its members; but no beneficiary certificate shall be assignable." This section, slightly amended, became section 5872, Revised Stat-

utes 1889, and section 5872 became section 7913, Revised Statutes 1899, supra.

Sections 1408 to 1423, supra, are a part of article 2 of chapter 12, entitled, "Benevolent, Religious, Scientific, Fraternal, Beneficial, Educational and Miscellaneous Associations."

We have thus located these statutes for the purposes, by way of analogy, of getting at the holdings of this and other courts upon the question now before us, i. e., did section 7896 constitute a part of the contract sued upon, and if so could such contract be changed by the subsequent act of defendant?

A similar question has been discussed by the Federal courts in the case of Jarman v. K. T. & M. Life Indemnity Co., 95 Fed. 70. The case was first in the District Court for the Western District of Missouri, and was reported as above. Thence it went to the United States Circuit Court of Appeals for the 8th District and the decision there is reported in 104 Fed. 638. From there it found its way to the United States Supreme Court, and is reported in 187 U. S. 197. The defendant in that case was an assessment insurance company chartered under the laws of Illinois. Jarman received his certificate in October, 1885. The defendant qualified and received State license in June, 1888. September 12, 1898, Jarman committed suicide. Defendant urged that section 7896 (then section 5855) did not apply because of our present section 7913 (then section 5872). Bearing in mind that section 7896, which we have set out above was formerly section 5855, and that section 5869, Revised Statutes 1889, set out above, was formerly section 10 of the Act of 1887, the following from Judge THAYER in the Jarman case is of interest. In 104 Fed. Reporter, at page 640, he says:

"In the case of Indemnity Co. v. Berry, 4 U. S. App. 353, 1. C. C. A. 561, 50 Fed. 511, it was held by this court, affirming the decision of Judge CALDWELL

on the circuit (Berry v. Indemnity Co., 46 Fed. 439), that a certificate or policy of insurance which was executed by the defendant company and delivered in the State of Missouri to a citizen of that State prior to 1887, and was in the same form, substantially, as the policy now under consideration, was a Missouri contract, and a policy of insurance, and that, being such, it was subject to the provisions of section 5855 of the Revised Statutes of Missouri of 1889, which declares, in substance, that, in suits on policies of insurance on life issued by any company doing business in the State of Missouri, it shall be no defense that the insured committed suicide, unless it is shown to the satisfaction of the court or jury trying the case that the insured contemplated committing suicide at the time he made his application for the policy, and that any stipulation in a life insurance policy to the contrary shall be void. The correctness of that view is not challenged on the present occasion, and as the policy in suit was issued to a citizen of Missouri, and delivered to him in that State, and the initial assessment there paid, it follows that when the policy was delivered it covered the risk of suicide, by virtue of the local statute. On March 30, 1887, nearly two years after the policy in suit was issued, the Legislature of the State of Missouri enacted a law with reference to insurance companies doing business on the assessment plan, which now appears in the Revised Statutes of that State for the year 1889, as article 3, c. 89 (being sections 5860 to 5872, both inclusive). This act placed foreign insurance companies doing business in the State on the assessment plan under the supervision of the insurance department of the State, and one section thereof (being section 5869) subjected such foreign assessment companies to all the provisions of section 5912 of the Revised Statutes of Mis-

souri for 1889, which was then in force, but concluded with the following proviso:

" 'Provided, always, that nothing herein contained shall subject any corporation doing business under this article to any other provisions or requirements of the general insurance laws of this State, except as distinctly herein set forth.'

"Section 5912, to which reference was thus made, related wholly to the mode of obtaining service on foreign insurance companies doing business within the State of Missouri; and it is accordingly claimed that the operation of the proviso was to relieve insurance companies doing business on the assessment plan, as distinguished from companies doing business in other ways, from the disability imposed by section 5855, to plead suicide as a defense, inasmuch as section 5855 forms a part of the general insurance laws of the State, and was not incorporated into the Act of March 30, 1887, relating to assessment companies. It is by no means certain that the proviso in question was intended by the lawmaker to except assessment companies from the operation of section 5855. The Legislature did not see fit to repeal that section, but left it standing and in full force as a part of the statute law of the State— at least, insofar as it affected ordinary life companies; and it is difficult to assign any reason for prohibiting companies of the latter kind from pleading the defense of suicide which does not apply with equal force to assessment companies. It has been held, however, in Haynie v. Indemnity Company, 139 Mo. 416, that from the date of its adoption the proviso did exempt assessment companies from the operation of section 5855, and enable them to plead suicide as a defense to policies thereafter issued which by their terms excluded the risk of death by suicide. Accepting that as an interpretation of a local law by the highest court of the State, which this court is required to adopt, we pass to the inquiry whether it was com-

petent for the Legislature, by the proviso in the Act of
March 30, 1887, to relieve the defendant company from
the operation of section 5855, as respects policies
theretofore issued and then outstanding, which were
clearly subject to its provisions when they were issued.
In considering this question, it must be borne in mind
that section 5855 not only provides that, in suits on
life insurance policies issued by companies doing busi-
ness in the State of Missouri, it shall be no defense
that the insured committed suicide, but also declares
that 'any stipulation in the policy to the contrary
shall be void.' The effect of this statute upon the pol-
icy in controversy was to expunge the provision which
is found therein, in substance, that it should become
null and void if Jarman took his own life, either sane
or insane. The contract, by force of the statute, took
effect as it would have done if no such clause as that
last referred to had been inserted, and embraced the
risk of death by suicide as well as from other causes.
Moreover, in legal contemplation, the first and all sub-
sequent premiums or assessments were paid by the in-
sured in consideration of the assumption by the in-
surer of the risk of death by suicide, as well as from
other causes, since the statute rendered the agreement
to the contrary utterly meaningless and nugatory. In
this way the statute was worked into the contract, and
became a part of it, and determined its meaning, scope
and effect. In the light of the statute, the parties must
be presumed to have agreed that the insurer would
assume the risk of death by suicide, because the law
would not permit them to agree otherwise. We are of
opinion, therefore, that it was not within the power of
the Legislature to declare in 1887, with respect to the
policy in suit, and others of a like character, that self-
destruction might be pleaded as a defense, which was
tantamount to saying that the policy should not com-
prehend the risk of death by suicide, because a legis-
lative enactment to that effect would impair the obli-

gation evidenced by the policy, contrary to the mandate of the Federal and State constitutions. [Const. Mo., sec. 15, art. 2; R. S. Mo. 1889, p. 59.]''

When the case reached the United States Supreme Court, Mr. Justice Brown entered into an elaborate discussion of the matter, some of which bears upon the exact question here. We quote lengthily from him, preferring his language to our own. We have italicised the portions striking at the exact point before us. At page 202 *et seq.,* 187 U. S., Mr. Justice Brown said:

''We are next brought to the consideration of the applicability of the suicide statute, section 5982, to policies of this company issued at this time. This act, upon its face, applies to all insurance companies 'doing business in this State,' and to all policies issued by such companies after the date of the act. It undoubtedly governs the rights of the parties in this case, except so far as the same may have been modified by an act passed in 1887, authorizing the incorporation of insurance companies on the assessment plan. Section 10 of this act, Laws 1887, pp. 199, 204, is now known as section 5869 of the Revised Statutes of Missouri of 1889, and provides that corporations 'doing business under this article' shall make certain annual statements, which, as well as other requirements, are also made applicable to foreign companies, with the following proviso: 'Provided, always, That nothing herein contained shall subject any corporation doing business under this article to any other provisions or requirements of the general insurance laws of this State, except as distinctly herein set forth.' It appears that the defendant in this case, which is a citizen of Illinois, *elected to take advantage of this law, and on June* 18, 1888, *received from the insurance department of the State authority to do business thereunder upon the assessment plan. As to policies issued upon the assessment plan subsequent to this date and*

*prior to 1897, the Supreme Court of Missouri held that the suicide statute, above quoted,* does not apply. [Haynie v. Knights Templars Co., 139 Mo. 416.] To the same effect are Hanford v. Massachusetts Benefit Assn., 122 Mo. 50; Jacobs v. Omaha Life Assn., 142 Mo. 49, and Aloe v. Mutual Reserve Assn., 147 Mo. 561. It is true the authority of these cases was somewhat shaken by the recent case of Aloe v. Fidelity Mutual Life Association, 55 S. W. 993, which did not involve the repeal of the suicide statute, but of another statute, providing that no misrepresentation should be deemed material, unless the matter misrepresented should have contributed to the death of the insured. The case, however, turned, as did the cases above cited, upon the scope of the proviso of section 5869, and a persuasive opinion was delivered by Judge VALLIANT in favor of the theory that the proviso was intended to relate only to the organization of the corporations, and the extent to which they should be subject to the supervision of the Department of Insurance, and under the Superintendent's control. This opinion was delivered in the first department of the Supreme Court, and, there being a dissent, the cause was transferred to the Court in Banc, wherein a majority of the court apparently differed from the views expressed by Judge VALLIANT, and reaffirmed the cases above cited. These cases, including the Haynie case, must therefore be regarded as representing the views of the Supreme Court that the suicide statute was actually repealed by the act of 1887, as to policies thereafter issued, and that view is, of course, binding upon this court.

*"But we are of the opinion that this statute was intended to be prospective in its operation, and that the rights of the defendant as an assessment company under the Act of 1887 began in June, 1888, with its certificate of authority to do business under that act, and with respect to policies anterior to that date the rights of the parties are to be determined by the suicide stat-*

*ute*, [*R. S.* 1889, *sec.* 5855.] It must be borne in mind that the repealing Act of 1887, now known as section 5869, Revised Statutes 1889, was not passed as an independent statute, but as section 10 of a new statute of fourteen sections, entitled, 'An act to provide for the incorporation and regulation of associations, societies or companies doing a life or casualty insurance business on the assessment plan.' The prior sections define what shall be deemed a contract of insurance upon the assessment plan, how the corporations are formed, what the policies should specify, giving general details with regard to the management of the business, and then providing in section 10, for annual statements made by 'every corporation doing business under this act,' with the provision that 'nothing herein contained shall subject any corporation doing business under this act to any provisions or requirements of the general insurance laws of this State, except as distinctly herein set forth.' This whole act, slightly amended in language, was carried into the Revised Statutes of 1889 as chapter 89, article 3. It seems to us quite clear that the declaration of the proviso that corporations 'doing business under this act' shall not be subject to the general insurance laws of the State, *applies only to corporations which took out a certificate of authority from the insurance department to do business on the assessment plan, and to policies thereafter issued by such companies*, notwithstanding the fact that such companies may have issued policies under the general insurance laws of the State prior to the Act of 1887. The words 'doing business' evidently refer to issuing policies and not to paying them. A man does business when he contracts obligations—he ceases to do business when he discharges them.

"This is not only the natural construction of the act, but to hold that the proviso applies to *policies antecedently issued might open it to the imputation of impairing the obligation of contracts previously en-*

*tered into between these companies and their insured,* since these policies amounted to a special agreement on the part of the companies that they would be liable in case of suicide—an agreement upon which the insured and his beneficiary were entitled to rely. The provision of the suicide statute, that it shall be no defence that the insured committed suicide, and that any stipulation in the policy to the contrary shall be void, must be considered as imposing a condition upon every policy thereafter issued, notwithstanding any stipulation in the policy to the contrary. It must be treated as an independent and binding obligation, and as overriding and nullifying any stipulation of the parties.''

When in the District Court, PHILIPS, J., in 95 Fed. l. c. 71, said:

''The first question therefore for decision, arising on the facts and evidence submitted, is, does the fact that the insured died by his own hand defeat the right of recovery on this policy? At the time of the issue of the policy,—which, admittedly, was a Missouri contract,—the following provision of the Missouri statute was in force:

'' 'In all suits upon policies of insurance upon life hereafter issued by any life insurance company authorized to do business in this State, it shall be no defense that the insured committed suicide, unless it shall be shown to the satisfaction of the court or jury trying the cause, that the insured contemplated suicide at the time he made his application for the policy, and any stipulation in the policy to the contrary shall be void.' [R. S. 1879, sec. 5982; R. S. 1889, sec. 5855.]

''The language of the statute is comprehensive. It applies to all 'policies of insurance on life hereafter issued by any life insurance company doing business in this State.' On a life policy issued by this same defendant tried in this court, it was distinctly held by Judge CALDWELL, on the circuit (Berry v. Indemnity Co., 46 Fed. 439), that this company at the time in

question was engaged essentially in life insurance business, and nothing else. This ruling was affirmed by the Court of Appeals. [1 C. C. A. 561, 50 Fed. 511.] It was as distinctly further held in this case that said section of the Missouri statute applied to such policies, and cut off the defense of death by suicide. The policy sued on in that case was issued in 1885, and the act of suicide was committed in November, 1889. As in the case at bar, the act of suicide was subsequent to the enactment of the statute of 1887, now section 5869, Revised Statutes 1889, relied upon by defendant to avoid the operation of said section 5855. Said Act of 1887, after directing that all insurance companies doing business in the State should make certain returns to the insurance department touching the state of its affairs, and subjecting it to visitation and examination, contained the following clause:

" 'And all such foreign companies are hereby declared to be subject to, and required to conform to, the provision of section 5912 of the Revised Statutes of Missouri of 1889; provided always, that nothing herein contained shall subject any corporation doing business under this article to any other provisions or requirements of the general insurance laws of this State, except as distinctly herein set forth.'

"The only feature which, in this respect, differentiates the Berry case from this, is the fact that in the former it did not appear from the evidence that the defendant company had ever complied with the provisions of the Act of 1887, or that it was doing business in Missouri under the requirements and liabilities imposed by the act; while in the case at bar, it does appear that, in 1888, the company complied with said statute, attempting to do business in the State on the assessment plan.

"It is to be conceded to defendant that, as to policies issued on the assessment plan, subsequent to the statute of 1887 and prior to 1897, said section 5855, de-

nying the defense of suicide, does not apply. [Haynie v. Indemnity Co., 139 Mo. 416.] The policy in the Haynie case was issued in 1888, and the insured committed suicide in 1893. It is on said Act of 1887 that the defendant's counsel have builded a most elaborate argument, on the assumption that this act superseded and repealed the provisions of said section 5855 in respect of assessment companies, and therefore the rights of the parties in this action are to be determined as if said section 5855 had been expunged from the statutes at the time the cause of action arose in this case. In support of this contention, reliance is placed upon rulings akin to that in Ewell v. Daggs, 108 U. S. 143, which was, in effect, that when the right of a party to a given contract to avoid it on the ground of a statutory enactment based upon the declared public policy of the State, where such right pertains rather to the remedy than an essential element of the contract, inducing its execution, may, by subsequent act of the Legislature, be entirely taken away, the parties are remitted to the terms of the contract as expressed on its face. Judge SHIRAS, who wrote the opinion of the Court of Appeals in the Berry case, declined to pass affirmatively upon the correctness of this contention, because it did not appear from the record before him that the company had complied with the provisions of the Act of 1887, entitling it to plead exemption from the operation of said section 5855. But it is quite apparent from the trend of his observations that the inclination of his mind was against the contention of the defendant, if the requisite facts had appeared. In that connection he said:

" 'Before this question can arise, it must be made clear that the Legislature of the State intended to repeal, by the Act of 1887, the provisions of section 5982 (now section 5855), in its applications to policies previously issued by companies doing business under the assessment plan; and, in our judgment, the intention

to repeal the section in this particular is not made clear. In the first place, the Legislature of Missouri has not repealed section 5982 (now section 5855). It is still the law of the State that companies engaged in the business of life insurance shall not be permitted to exempt themselves from liability for death by suicide not contemplated when the application for its insurance is made.'

"His assertion was correct. The Act of 1887 only exempted assessment companies from the operation of section 5855. In other words, it only suspended its operation in its application to assessment insurance companies; and in view of the general law, and especially of the Constitution of Missouri, the Act of 1887 only had, and could only have, a prospective operation, and in no degree affected antecedent policies issued by such companies.

"Counsel misconceive the character of section 5855. It is something more than a mere declaration of the State as to its public policy prohibiting such contracts, and affecting merely the remedy, which the Legislature might at will revoke, leaving in force the provisions of a policy that an act of suicide could be pleaded to defeat recovery thereon. On the contrary, this statute became a constituent element of the contract itself between the parties, constituting a part of the consideration for entering into the contract. In contemplation of law it is the same as if it had been written into the face of the policy, that, in case of a suit to enforce the payment of a stipulated sum, the defendant should not plead thereto that the insured committed suicide, unless it should be shown that the insured contemplated suicide at the time he made his application for the policy, and any stipulation in the policy to the contrary should be void. Judge DILLON, in White v. Insurance Co., 4 Dill. 177, speaking of another section of this same statute respecting the ef-

fect of misrepresentations made in obtaining or securing the policy, said:

" 'We are of opinion that policies of insurance issued and delivered in Missouri, after that act took effect, fall within its prospective operation, and, as to such policies, the act is to be treated as if incorporated therein. . . . The general rule is that the laws in existence are necessarily referred to in all contracts made under such laws, and that no contracts can change the law.'

"This same principle was announced by Chief Justice SHERWOOD in State ex rel. v. Berning, 74 Mo. 87: 'For whatsoever the law annexes as the incident of a contract, whether granting a privilege or announcing a prohibition, is as much part and parcel thereof as though written therein or endorsed thereon.'

"See, also, Reed v. Painter, 129 Mo. 680. Again, in the recent case of Cravens v. Insurance Co., 148 Mo. 583, the Supreme Court say: 'Being a Missouri contract, the statute then in force, with respect to the subject-matter of the contract, entered into and became a part thereof as much so as if copied therein.'

"We may conclude this part of the discussion by the application of the appropriate language of Mr. Justice GRAY in Society v. Clements, 140 U. S. 233, which went from this court: 'The statute is not directory only, or subject to be set aside by the company with the consent of the assured, but it is mandatory, and controls the nature and terms of the contract into which the company may induce the assured to enter.'

"The provisions of section 5855 being a constituent part of the contract of insurance, it would not have been competent, even had it so attempted, for the Legislature to destroy the protecting provisions of this statute by a subsequent repeal thereof (which it does not attempt to do), as it relates to antecedent policies of insurance; this, for the obvious reason that

the Constitution of the United States prohibits the States from passing any law impairing the obligation of contracts.''

The force of these opinions is (1) that section 7896—the suicide statute—is more than a declaration of legislative policy affecting a remedy solely, but that it is substantive law entering into the contract itself, (2) that it is broad and enters into all contracts affecting life indemnity, (3) that the Act of 1887 respecting assessment companies was but an exemption from this general statute, (4) that an assessment company to have the benefit of such exemption must qualify and take out a license under the law, (5) that until it did so qualify and take out a license it was not entitled to such an exemption, and the general suicide statute entered into each and every one of their contracts prior to the time such company complied with the statute, and (6) that a subsequent compliance with the statute would not affect the contracts theretofore written, and would not eliminate therefrom the effect of the suicide statute.

This holding by the three successive Federal courts is of peculiar significance in the determination of the single question presented by the record in the case at bar. The Act of 1897 simply exempts fraternal beneficiary associations from the general insurance laws. By thus exempting them the Legislature recognized that but for the exemption, their contracts would be governed by the general laws, for if not, there would be no reason for the exemption.

Nor is it unreasonable to say, as was said in the Jarman case, that the defendant in the case at bar cannot claim the benefits of an exemption provided by a law, until such time as it places itself in a position to claim the benefits of the law. It cannot claim the benefits of the law merely because its contracts are of the character mentioned in the law, but to claim the exemption given it must come in under the law, and

make its contracts under the law. If it does that, then the law is read into and becomes a part of the contract, but until it does do that the general law is and must be read into each and every one of its contracts made with a citizen of Missouri. Not only so, but if such general law once becomes a material constituent part of the contract, it cannot be eliminated therefrom by the subsequent act of the defendant. And we are of opinion that the suicide statute is substantial law, and not merely a statute of procedure.

Had the statute stopped without the concluding clause, there might be substance in the claim that it only affected procedure. The concluding clause "any stipulation in the policy to the contrary shall be void," is certainly substantive law, and vitally affects all contracts to which it applies. It breathes into every contract of life insurance indemnity for death by suicide, provided it cannot be shown that suicide was contemplated at the time the insurance was taken out. This indemnity is a substantial right given by the statute of the State to its citizens. Its legal effect is to strike down, erase and wipe out all clauses of a contract of insurance contravening its terms. It leaves the contract as though such clause had not been written. The substantial rights of the parties are as if such contravening clause had not been written. In the language of Judge Thayer, "In the light of the statute, the parties must be presumed to have agreed that the insurer would assume the risk of death by suicide, because the law would not permit them to agree otherwise." An agreement to assume such a risk and indemnify for such a death is a valuable and substantial right. Then as to the failure of defendant to qualify under the Act of 1897 prior to the issuance of the policy, it should be remembered that such act only gives an exemption to such associations as comply with the act. This is manifestly the purpose of the act. An association doing business in the State, and making Missouri con-

tracts with our citizens in violation of our laws, is in no position to claim an exemption allowed by the laws to other similar associations, which have complied therewith.  Our statutes in effect say to foreign associations, If you do not see fit to qualify under our laws, then your contracts made in our State and with our citizens shall not contain a suicide clause, but if you do qualify and take out license then you can write your contracts in a different form.  Such limitation the State can prescribe.  But it is left to the association to elect which contract it will make.  It can make a contract which will bind itself, without taking out the license, but if it does no absolute suicide clause shall be contained therein.  When the association elects as to which contract it will make, as did defendant in this case, then that contract is fixed in character by the statutes which must be read into it at the time of the making, and not by statutes subsequently passed, or by statutes already passed, but which are unavailing because of the fact that the association was not in position to write such statutes into the contract.

Passing now to the decisions of the courts in this State, it will be found that the exact question has been up in but few instances.  The opinions come from the Kansas City Court of Appeals.  The first is Huff v. Woodmen, 85 Mo. App. 96.  In that case deceased became a member in July, 1895, and committed suicide in October, 1898.  In the Huff case, ELLISON, J., among other things said:

"But by the Act of 1897 (Laws 1897, p. 132) it was provided that, on compliance with certain provisions therein, foreign companies would be exempted from the provisions of section 5855.  In other words, the privilege of exemption from the section just cited was extended to foreign companies.  But that law, though enacted before deceased's death, was long after the contract was made between him and defendant. There is nothing in that law to show that it was in-

tended to operate on existing contracts and it will not be construed to be retrospective unless clearly so intended. [Fisher v. Patton, 134 Mo. 52; Reed v. Swan, 133 Mo. 100; Leete v. Bank, 115 Mo. 184.] We, therefore, leave it out of consideration and hold this case to be governed by the statute in force when the contract was made.

"But defendant claims that conceding the law of 1897 is not applicable to this contract, and that sections 2823 and 2824 of the general statutes are likewise not applicable, yet it may still claim the right to defend for suicide on the ground that by force of its by-laws which the court struck out of the answer, and by which deceased, as a member, was bound, it was declared that suicide should render the certificate of insurance void. We reject this view for two reasons: First, when we place the certificate or policy issued by defendant outside the protection of either section 2823 or the law of 1897, it necessarily falls under section 5855, which, as we have seen, declares that a policy issued by 'any company doing business in this State' shall not be open to the defense of suicide. Defendant certainly is such a company and must fall within the section; second, the by-law relied upon which was stricken from the answer clearly refers to certificates thereafter issued. It does not refer to those already in existence. What we have said as to the presumption against retrospective laws will apply to the by-laws of a corporation."

Later, the same court, in Brasfield v. Modern Woodmen, 88 Mo. App. 212, said:

"A careful examination of the defendant's charter and by-laws undoubtedly shows that the defendant incorporation is carried on for the sole benefit of its members and their beneficiaries, and not for profit. And that in every essential detail it exists and is carried on as a fraternal beneficial association within the meaning of said section 1408, supra.

"But the plaintiff insists that not having complied with the terms of sections 1409 and 1410, Revised Statutes 1899, the defendant is not exempt from the general life insurance laws of the State, and that, therefore, the proviso in said certificate voiding the same in case of suicide of the member is to be construed by the terms of said general insurance laws. See Revised Statutes 1899, section 7896, which is to the effect that 'in all suits upon policies of insurance on life hereafter issued by any company doing business in this State, to a citizen of the State, it shall be no defense that the insured committed suicide, unless it be shown to the satisfaction of the court or jury trying the cause, that the insured contemplated suicide at the time he made his application for the policy, and any stipulation in the policy to the contrary shall be void.'

"It is shown by the record that the defendant did not avail itself of the benefit of the Act of March 16, 1897 (R. S. 1899, sec. 1410), so as to exempt itself from the liabilities of section 7896, supra. The certificate of the superintendent of insurance discloses that it did not comply with the requirement of the fraternal beneficiary laws of the State until the first of March, 1900, whereas, this certificate in question was issued on the seventh day of August, 1899, and his death occurred December 27th, following—all in the year prior to that in which defendant began business in this State as a fraternal beneficiary corporation. As the constitutional validity of the Act of March 16, 1897, is not called in question here, it is clear that under the terms of said act, the provision in the certificate exempting defendant from liability in the contingency that the insured committed suicide within three years from the date of the certificate, is not a defense to the plaintiff's demand until it is proved that the member contemplated suicide at the time he made his application for insurance."

And in another case since, that of Brassfield v. Knights of Maccabees, 92 Mo. App. l. c. 105, that court said:

"The defendant's answer shows that it is a foreign corporation, but it does not allege that it was doing business in the State at the time of the enactment of the Act of 1897, or that it began business in the State since its enactment. Nor does it allege that it had complied with either of said sections 1409 or 1410, supra. But instead it alleges that it was doing business in the State 'pursuant to its own laws, rules and regulations.' Sections 1420, 1421 and 1422, Revised Statutes, supra, provide for penalties against the officers of any association within the meaning of the act who have failed to comply with its terms. It is presumed from the answer of defendant that it had not complied with said Act of 1897, or it would have alleged it. It was sued on an alleged liability for the death of one of its members it had assured. Its defense is that he committed suicide, which act of the member it claimed voided the contract of insurance under the conditions of the policy or certificate, because it was doing business in the State under its own rules and regulations as a benefit association. The answer falls short of making a defense, because it fails to allege that it was also doing business under the laws of the State, for unless it was so doing business, it was acting in disregard of the laws of the State, and subjecting its officers to the pains and penalties of the statute. If it was not doing business at the time it issued the certificate in suit, as a fraternal beneficial association, and also doing business under the regulation of the statute in question, its liability would be measured by section 7896, Revised Statutes, supra, which provides that 'in all suits upon policies of insurance on life hereafter issued by any company doing business in the State to a citizen of the State, it shall

be no defense that the insured committed suicide, unless it be shown to the satisfaction of the court or jury trying the cause, that the insured contemplated suicide at the time he made his application for the policy, and any stipulation in the policy to the contrary shall be void.' [Brasfield v. Modern Woodmen, supra.] There was no attempt made to show that the deceased contemplated suicide at the time the certificate was issued. As the defendant must be held to have been doing business in this State as a fraternal beneficiary association, without complying with the laws in question, and its officers thereby violating a penal statute at the same time, it should be held strictly accountable. It is the duty of the courts to uphold the sovereign power of the State in its efforts by wise and judicial laws to protect its citizens from the acts of irresponsible corporations, which was evidently the purpose of the legislative enactments we have had under consideration. The cause is affirmed.''

The opinion in the case at bar, written by the St. Louis Court of Appeals, 124 Mo. App. 165, is in conflict with these cases. The opinion is based upon what the writer thereof conceived to be the force and effect of Westerman v. Knights of Pythias, 196 Mo. 670. We are therefore confronted with the proposition as to whether or not our holdings in the Westerman case affect the rulings of the Kansas City Court of Appeals in the cases supra. We think not. In the Westerman case we determined from the evidence whether in fact the Knights of Pythias was an old-line insurance company or a fraternal beneficiary association, and upon this question two of the judges dissented. Next we held that our non-forfeiture statute, Revised Statutes 1899, section 7897, did not apply to the contract. In that opinion at pages 726 et seq., we considered sections 7897 and 7898 together. In concluding that discussion, we then said:

"This court would not be warranted in ignoring the provisions of 7898, if its provisions in any way indicate the nature and character of policies contemplated by the non-forfeiture section (7897). It is immaterial that they are separate sections; they must be construed, covering as they do, the same subject-matter, as though their provisions were embraced in one section. That section 7898 clearly indicates that the policies contemplated by the non-forfeiture statute are such as will admit of the holder of a policy to obtain a paid-up policy as provided by the statute, is too plain for discussion. In other words, the policies contemplated in the non-forfeiture section must be broad enough to cover both extended insurance by reason of the net value of the policy as provided by that section and the right to a paid-up policy as provided in section 7898. The right to a paid-up policy is as broad as the right to extended insurance, and we see no escape from the conclusion that no other policy can be meant to be embraced in section 7897 than those which will admit of the enforcement of the rights so clearly pointed out in the two sections treating of the subject. The provisions of section 7898 make it so apparent as to what class of policies are meant to be embraced in section 7897 that it does not admit of dispute. It plainly recognizes the right of extended insurance, and then in effect says, to the holder of a policy, If you do not care to take extended insurance any time within sixty days from the beginning of your extended insurance, as provided by section 7897, you may demand a paid-up policy; hence the policy contemplated by section 7897 must be of that nature and character as will cover either right the policy-holder may elect to avail himself of when the conditions designated by the statute confront him. With this interpretation of sections 7897 and 7898, it is only necessary to add that no one will seriously contend that the benefit certificate upon which this suit is brought is that charac-

ter of policy contemplated by the non-forfeiture section, and broad enough to cover both extended insurance purchased by the net value of the policy at the time of the forfeiture and the right to a paid up policy. It therefore must be held that the benefit certificate sued on does not fall either within that class of policies known and recognized in insurance circles as will admit of the holder obtaining a paid-up policy as provided in section 7898, to which alone the non-forfeiture provisions of section 7897 are directed and made applicable.

"It is insisted, however, by learned counsel for respondent that this is not a correct interpretation of the non-forfeiture law for the reason that no kind of policies are excepted from the non-forfeiture statute, hence all kinds are embraced within it. This reasoning is ingenious, but by no means sound. The two sections of the statute (and they must necessarily be construed together) in plain and unambiguous terms point out the character of policies to which the non-forfeiture law is meant to apply, and the rights to which the policy-holder is entitled; hence, it would be illogical to say that it embraced others of an entirely different character. If that was true it would simply amount to importing into the statute a character of policy which, if forfeited, would not admit of the full enforcement of the rights guaranteed by the provisions of the statute."

Thus it will be seen that there was a real disposition of this case upon the theory that the contract itself was one to which the statutes 7897 and 7898 could not be made applicable. In other words, inherently these statutes were not, and could not be made, applicable. Thus it further appears there was a real disposition of this case without a consideration of any exemption being allowed to fraternal beneficiary associations. This inherent non-applicability of the non-

forfeiture statutes does not apply to the suicide statute.

But the opinion does discuss the exemption of fraternal beneficiary associations. In that discussion it recites that the first act pertaining to them was passed in 1868. That in 1881, Laws of 1881, p. 87, such associations were exempted from the general insurance laws. The opinion then suggests that Westerman became a member in 1883 whilst this act of 1881 was in effect. It is true that in 1893 after the repeal of the act of 1881, and when we had no law exempting fraternal beneficiary associations, Westerman, under a new provision of the by-laws of the association, was permitted to take out $2000 additional insurance, and the last certificate covered the whole, *i. e.*, the $3000 original and $2000 additional. But of this we there said:

"The record discloses that it was while the law of 1881 was in force which authorized the issuance of benefit certificates by fraternal associations, whether organized under the laws of this State, or any other State or Territory, and which exempted such association from the application of the general insurance laws, that the original certificate for $3000 was issued to Jacob Westerman. The date of that certificate was the 13th day of August, 1883. In 1893 the rules and regulations of the defendant association had been so changed as to authorize the issuance of certificates for $5000 and under this change of rules, as is indicated by the application, Mr. Westerman did not apply for a new contract or new certificate, unless by legal construction it is to be made a new contract, and a new certificate. He stated in his application: 'I am now insured in the Endowment Rank for $3000 and desire to increase to $5000, or two additional thousands.' This benefit certificate was issued in 1893 for the increased amount of $2000, including the former amount of $3000, making a total of $5000."

Just following this is a clear recognition of the idea that the suicide section is applicable to policies of the kind involved in this case. Judge Fox in the Westerman case thus further speaks:

"The contention of respondent is that upon such state of facts and the law correctly applied to it, there being no law in force in this State from 1889 to 1897 authorizing the defendant association to transact business as a fraternal beneficiary association, and the benefit certificate sued on bearing date in the year 1893, the non-forfeiture statute heretofore referred to is applicable to and must govern the benefit certificate in suit. This contention is predicated upon the doctrine announced by Marshall, J., speaking for this court in the case of Kern v. Legion of Honor, 167 Mo. 471. It is true in that case the provisions of the general insurance law, which provided 'that no representation in procuring a policy of insurance shall be deemed material or avoid the policy unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and whether it so contributed shall be a question for the jury,' was held applicable to that benefit certificate. But we take it that it by no means necessarily follows that the non-forfeiture statute is alike and also must be made applicable to benefit certificates of that character. The application of that provision of the general insurance laws or the provisions in respect to suicide constituting no defense to certificates of this character, falls far short of meaning that every provision of the general insurance law shall be applied to certificates of this character, and it may for the purposes of this case be conceded that certain provisions of the general insurance laws may be broad enough to embrace within such provisions certificates of the character issued by the defendant association, yet this would not authorize this court to apply the provisions of the non-forfeiture statute to a

benefit certificate, which as heretofore pointed out, is not embraced or contemplated by the provisions of such non-forfeiture statute.''

And further in this connection, he said: ''In reaching the conclusions in this cause as herein indicated, we are not unmindful of the rules of law announced in the cases by this court which are chiefly relied upon by learned counsel for respondent, that is, the case of Toomey v. Knights of Pythias, 147 Mo. 129, and Kern v. Legion of Honor, 167 Mo. 471. It is only necessary to say of these cases, so confidently relied upon by respondent, that a careful analysis of them makes manifest the distinguishing features from the case at bar. In the first place, as heretofore pointed out, in neither of them was the question in the case at bar, that is, the application of the provisions of the non-forfeiture statute to fraternal beneficiary associations, involved, nor was it discussed. Secondly, there is a marked distinction between the provisions of the general insurance laws which were made applicable in those cases and the provisions of the non-forfeiture statute, section 7897, which is sought to be applied to the defendant association in this case.''

It will be observed that neither Toomey v. Knights of Pythias, 147 Mo. 129, nor Kern v. Legion of Honor, 167 Mo. 471, is overruled, but they are distinguished from the Westerman case. The language used to distinguish largely applies to the Kern case, for as a fact, the gist of the Toomey case is to hold that the Knights of Pythias is not a fraternal beneficiary association in its organization. The Westerman case holds that it is, and therefore upon that question, which is the paramount question in the Toomey case, overrules the Toomey case.

The rulings in the Kern case are not overruled by the Westerman case. In Kern's case, it was ruled that a beneficiary certificate issued in 1895, when there was no exemption as to fraternal beneficiary associations,

was subject to the general insurance laws in so far as the alleged false statements in the application for the insurance were concerned.

A review of the statutes and the cases satisfy us that the trial court was in error when it found for the defendant upon the issue of suicide.

The question of false statements has not been urged. If it had been we think there is nothing in it. The alleged false statement was that the applicant had no brothers and sisters. The proof was that he had half-brothers and half-sisters. Even without our statute, under the general insurance law we do not think this fatal. Under the statute as applied in the Kern case, supra, it certainly is not fatal. It therefore follows that the trial court erred in its judgment in this case, and the St. Louis Court of Appeals was in error in affirming such judgment, and their opinion thereon is overruled, and the doctrine announced in the several cases from the Kansas City Court of Appeals, supra, is approved. The judgment of the circuit court is reversed and the cause remanded to be proceeded with in accordance with this opinion. All concur.